# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued September 18, 2006 Decided February 2, 2007

No. 05-5221

LONI CZEKALSKI,
APPELLANT

v.

MARY E. PETERS, SECRETARY OF TRANSPORTATION,
APPELLEE

---

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01403)

---

*Ellen K. Renaud* argued the cause for appellant. With her on the briefs was *David H. Shapiro*.

*Darrell C. Valdez*, Assistant U.S. Attorney, was on the brief for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Michael J. Ryan*, Assistant U.S. Attorney, entered an appearance.

Before: ROGERS and GARLAND, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: In 1997, the Federal Aviation Administration reassigned appellant Loni Czekalski -- then a senior career official -- to a new position with different responsibilities. She alleges that the reassignment was effectively a demotion, and that it resulted from gender bias on the part of her immediate supervisor. Because this allegation must be resolved in a jury room rather than in the pages of the Federal Reporter, we reverse the magistrate judge's grant of summary judgment in favor of the government.

I

Czekalski began working for the Federal Aviation Administration (FAA) in 1970, rising through the ranks to become a member of the Senior Executive Service (SES). In November 1994, she became Director of the Office of Communication, Navigation, and Surveillance Systems (known as "AND"), with responsibility for several hundred employees, multiple programs, and an annual budget of approximately $400 million. Czekalski reported directly to George Donohue, the FAA's Associate Administrator for Research and Acquisitions, who had selected her for the position.

On June 12, 1997, Donohue reassigned Czekalski from the position of Director of AND to that of Program Manager of the Year 2000 (Y2K) Project, a program within the Office of Information Technology. By memorandum, he advised her that he was making the reassignment because she had "not performed up to the standards I expect from my direct reports, particularly in the area of communications." Donohue Mem. at 1 (June 12, 1997). The memorandum listed four specific areas in which Donohue said Czekalski's performance had been unsatisfactory. Although he stated that this was "a lateral move involving no loss of pay or SES status," *id.* at 2, there were some undeniable changes in the nature of her job: she now reported to

a former peer, supervised fewer than ten employees, managed a single program, and did not have a separate budget.

Shortly after receiving Donohue's memorandum, Czekalski sent her own memorandum to the Secretary of Transportation, rebutting Donohue's stated reasons for the reassignment and asking the Secretary to restore her to the position of AND Director. Czekalski Mem. (June 16, 1997). This prompted an investigation by the Office of Inspector General (OIG), which reviewed the dueling memoranda, interviewed both parties, and prepared a brief report summarizing its findings.

On July 12, 2002, after exhausting her administrative remedies, Czekalski filed suit against then-Secretary Norman Mineta in his official capacity. The complaint alleged that her reassignment was motivated by gender discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Thereafter, the parties agreed that the district court should refer the case to a magistrate judge for all purposes. *See* 28 U.S.C. § 636(c)(1).

On March 31, 2005, the magistrate judge granted the Secretary's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The magistrate found that Czekalski failed to make out a prima facie case of gender discrimination, both because Czekalski's reassignment did "not rise to the level of an actionable adverse employment action," and because she failed to "demonstrate that she and a similarly situated person outside her protected class were treated disparately." *Czekalski v. Mineta*, No. 02-cv-1403, slip op. at 16 (D.D.C. Apr. 21, 2005). The magistrate also held that, "[e]ven if Plaintiff could make out a prima facie case, she failed to rebut the Defendant's legitimate, nondiscriminatory reasons for the reassignment." *Id.* This appeal followed.

4

II

We review the magistrate judge's decision to grant summary judgment de novo. *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002); *see* 28 U.S.C. § 636(c)(3). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 477 U.S. at 248, and a moving party is entitled to judgment as a matter of law only if the nonmoving party "fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We must view the evidence in the light most favorable to the nonmoving party (here, Czekalski), draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).

Title VII prohibits federal agencies from discriminating in employment on the basis of sex. The statute requires that "[a]ll personnel actions affecting employees . . . in [federal] agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Although this language differs from that of the provision governing private employers, *see* 42 U.S.C. § 2000e-2(a), we have held that the two contain identical prohibitions, *see, e.g.*, *Singletary v. District of Columbia*, 351 F.3d 519, 523-24 (D.C. Cir. 2003) (citing, inter alia, *Bundy v. Jackson*, 641 F.2d 934, 942 (D.C. Cir. 1981)).

Where, as here, the plaintiff's claim of discrimination is principally supported by circumstantial evidence, we analyze the claim under the framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under that framework, "the plaintiff must [first] establish a prima facie case of discrimination." *Reeves*, 530 U.S. at 142. Once she has done that, the burden shifts to the defendant, who must "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802; *see Reeves*, 530 U.S. at 142. If the defendant satisfies that burden, "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves*, 530 U.S. at 142-43 (citations and internal quotation marks omitted). Thereafter, to "survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citing *Aka*, 156 F.3d at 1290).

The evidence that must be considered includes: "(1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment)." *Aka*, 156 F.3d at 1289. We consider these three evidentiary categories below.

III

We begin with the plaintiff's prima facie case. Before doing so, however, we note that the defendant has already

articulated nondiscriminatory reasons for Czekalski's reassignment, in the form of the reassignment memorandum that Donohue sent her. As the Supreme Court has explained, once a defendant has proffered such a nondiscriminatory explanation, it has "done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). At that point, "whether the plaintiff really did so is no longer relevant," and the only question is "'whether the defendant intentionally discriminated against the plaintiff.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *see Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 653-54 (D.C. Cir. 2003); *Waterhouse*, 298 F.3d at 993 n.6. Accordingly, we evaluate Czekalski's prima facie case not to determine whether it was properly established, "but rather because [her] prima facie case is part of the evidence we must consider in addressing th[e] question" of whether she has created a genuine issue of gender discrimination. *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005).

A plaintiff "makes out a prima facie case of disparate-treatment discrimination 'by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Id.* at 412 (quoting *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)) (additional internal quotation marks and citation omitted). The magistrate judge correctly found the first prong satisfied. The magistrate erred, however, in holding that Czekalski failed to establish both of the other two prongs.

A

In support of the magistrate's holding that the reassignment did not constitute an adverse action, the government argues that,

"[b]ecause [Czekalski] did not experience any loss of salary, grade level, or benefits, her reassignment is properly characterized as a 'lateral transfer.'" Appellee's Br. 15. Although the government is "correct in considering this case as one of lateral transfer," it errs in its implied premise that a lateral transfer cannot constitute an adverse action. *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003). To the contrary, "there *are* lateral transfers that could be considered adverse employment actions." *Id.* "[W]ithdrawing an employee's supervisory duties," for example, "constitutes an adverse employment action." *Id.*; *see Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002). So, too, does "reassignment with significantly different responsibilities." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006).

Czekalski has raised a genuine issue as to whether the reassignment left her with "significantly different" -- and diminished -- supervisory and programmatic responsibilities. According to Czekalski, as Director of AND she oversaw 260 federal employees, approximately 700 contract employees, over fifty separate programs, and an annual budget of approximately $400 million. Czekalski Mem. at 1. Donohue's estimation is not materially different: he testified that at AND, Czekalski had approximately 500 employees and a budget of approximately $750 million per year. Donohue Dep. at 49-50, 122. After the reassignment, by contrast, Czekalski testified that she supervised fewer than ten employees and worked primarily on just one program -- the Y2K initiative -- with "little to no budget of [its] own." Czekalski Dep. at 108 (Sept. 25, 2000). Donohue did not disagree. Donohue Dep. at 123-24.

Czekalski also proffered evidence that the reassignment moved her down the FAA hierarchy. Prior to the reassignment,

Czekalski reported directly to Donohue. At that time, Donohue agreed, Czekalski "was a colleague on an equal level with" another manager, Theron Grey, who Donohue also supervised. Donohue Dep. at 120. After the reassignment, however, Czekalski reported not to Donohue but to Grey, who continued to report to Donohue. *See id.* In short, the reassignment left Czekalski reporting to a former peer.

The defendant contends that, notwithstanding the difference in responsibilities, the reassignment was not an adverse action because "the new Y2K program was of 'extreme importance' to the agency." Appellee's Br. 16 (quoting Donohue Dep. at 120). In support of that proposition, the defendant submitted evidence that the Y2K program was a "priority" initiative at the FAA. Donohue Dep. at 121; DeGaetano Dep. at 26-27. But Czekalski introduced substantial evidence showing that, at the time she took the helm in 1997, the Y2K initiative was *not* as important to the FAA as her prior responsibilities were.[1] We also note that a reasonable jury could well find it difficult to reconcile the government's insistence that the Y2K job was a position of "extreme importance" to the agency, with Donohue's assertion that he reassigned her to that position because she had failed to perform up to expected standards.

Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury

---

[1]*See* Carrico Dep. at 26 (stating that Czekalski's prior position, Director of AND, was "much more important to the agency" than her new role working on information technology); Crossetti Decl. at 2 (declaring that, "[w]hile the Year 2000 Project was important, in June of 1997, it was not as highly visible as" other programs that had previously been under Czekalski's purview); Zaidman Dep. at 70 (stating that the FAA did not recognize the Y2K issue "as being [a] really critical thing" until 1998 or 1999).

question. *See Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2417 (2006). The court may not take that question away from the jury if a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities. *See Holcomb*, 433 F.3d at 902. Viewing the evidence in the light most favorable to Czekalski, we conclude that a reasonable juror could find that Czekalski suffered an adverse action.

B

The magistrate judge further concluded that Czekalski failed to establish a prima facie case because "a trier of fact [would have] no basis to draw an inference that gender was a factor in Mr. Donohue's decision to demote" her. *Czekalski v. Mineta*, slip op. at 16. In support, the magistrate held that, to establish a prima facie case, a "plaintiff must demonstrate that she and a similarly situated person outside her protected class were treated disparately," and that Czekalski failed to so demonstrate. *Id.* As we said in *George v. Leavitt*, however, "[t]his is not a correct statement of the law." 407 F.3d at 412. Although "[o]ne method by which a plaintiff can satisfy the third prong of [the prima facie] test is by demonstrating that she was treated differently from similarly situated employees who are not part of the protected class, . . . this is not the only way." *Id.* In a discharge case, we explained, another way would be to show that "the discharge was not attributable to the two [most] common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *Id.* The same suffices in a reassignment case like this one. Here, there is no claim that Czekalski's reassignment was "precipitated by the elimination of her job" and, as explained in the next Part, she has "created a genuine issue as to whether she was performing at a satisfactory level." *Id.* at 413.

As we noted in *George*, "[w]e make [these] point[s] on the prima facie case not to 'evade[] the ultimate question of discrimination *vel non*,' but rather because [Czekalski's] prima facie case is part of the evidence we must consider in addressing that question." *Id.* (quoting *Aikens*, 460 U.S. at 714). The heart of Czekalski's evidence, however, is not the minimal showing required for her prima facie case, but rather the evidence that we consider in Parts IV and V.

IV

The principal evidence of discrimination upon which Czekalski relies is her "attack [on] the employer's proffered explanations for its actions." *Aka*, 156 F.3d at 1289. We have noted many times before that one way for a plaintiff to show that an adverse employment decision was made for a discriminatory reason is to "show[] that the nondiscriminatory explanation the defendant proffered for its decision was false." *Lathram*, 336 F.3d at 1089; *see, e.g.*, *Murray v. Gilmore*, 406 F.3d 708, 716 (D.C. Cir. 2005); *Salazar v. Washington Metro. Transit Auth.*, 401 F.3d 504, 511-12 (D.C. Cir. 2005); *Anderson v. Zubieta*, 180 F.3d 329, 348 (D.C. Cir. 1999); *Aka*, 156 F.3d at 1293-94. As the Supreme Court has explained, "[p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147. In "appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*

Donohue outlined his nondiscriminatory explanation in the memorandum he sent Czekalski notifying her of the reassignment. The memorandum advised Czekalski that he was reassigning her because she had "not performed up to the

standards I expect from my direct reports," and it identified four specific programs as to which Czekalski's performance had been lacking. Czekalski responded with a memorandum of her own (which she subsequently supplemented by her deposition), and the OIG then investigated. The OIG's report largely confirmed Czekalski's rebuttals; indeed, it noted that Donohue withdrew several of his assertions in the course of his OIG interview.[2]

The first performance failure that Donohue identified involved the FAA's Wide Area Augmentation System (WAAS). Donohue's memorandum to Czekalski stated that, "[f]or more than two years now, . . . you have failed to bring my attention to under-reporting of costs associated with the Wide Area Augmentation System." Donohue Mem. at 1. In response, Czekalski wrote that she had briefed Donohue regarding the WAAS cost overruns as early as October 1996, eight months before her reassignment. Czekalski Mem. at 2. When confronted with this response in his interview with the OIG, Donohue conceded that "any focus on WAAS problems in his memorandum is a 'complete red herring' and that Ms. Czekalski's reassignment from her position was not the result of WAAS." OIG Mem. at 2. The OIG's report concluded that "Czekalski's written rebuttal addressing specific statements on WAAS made in Dr. Donohue's memorandum w[as] generally valid." *Id.* at 3.

---

[2]The Government contends that the OIG report is "inadmissible" because it "is made up of inadmissible conclusions and multiple level hearsay that are not 'evidence' for purposes of a summary judgment motion." Appellee's Br. 30. The magistrate judge did not so rule and, to the contrary, it appears that the OIG report would be admissible as a public report under Federal Rule of Evidence 803(8), and that the statements Donohue made to his OIG interviewers (recited in the report) would be admissible as admissions by a party-opponent under Rule 801(d)(2).

12

The second failure identified by Donohue involved the National Airspace Integrated Management System (NIMS). Donohue stated that Czekalski had "failed to make me aware of the deteriorating leadership problem with the NIMS program," and that "[n]ow, we are at a point where ATS [Air Traffic Services] feels the situation has gotten so bad that we need to transfer leadership to ATS." Donohue Mem. at 1. Czekalski responded that she had remedied the leadership problems within NIMS by replacing several employees, and that "these personnel actions and results were communicated to Dr. Donohue." Czekalski Mem. at 3. By the time of his OIG interview, Donohue had retreated from this charge as well, stating his view that "NIMS project leadership should not be changed and should not be transferred to Air Traffic Services." OIG Mem. at 4.

Third, Donohue wrote Czekalski that "you also have failed to provide the [Integrated Product Teams] the kind of direction and support they need to carry out their work," particularly "the team working on the next-generation radio." Donohue Mem. at 2. But Czekalski pointed out that her office did not have responsibility for directing and developing the next-generation radio effort mentioned by Donohue. Czekalski Mem. at 3. Again, Donohue essentially conceded the issue when he spoke with the OIG. He told the OIG that the next-generation radio project was in the "investment analysis phase," and "confirmed statements in Ms. Czekalski's . . . memorandum . . . that projects in [that] phase are the responsibility of another office." OIG Mem. at 5.

Finally, Donohue's memorandum complained that Czekalski had "allow[ed] the [Automatic Dependent Surveillance - Broadcast (ADS-B)] program to languish." Donohue Mem. at 2. In response, Czekalski stated that she could not be charged with allowing the ADS-B program to languish, because the program had not been funded during her

time as director.  Czekalski Mem. at 3.  The OIG largely "confirmed Ms. Czekalski's statement."  OIG Mem. at 6.

To be sure, in both his OIG interview and subsequent deposition, Donohue attempted to "clarif[y]" some of the assertions in his 1997 memorandum and to "change the period of time for which he claimed to be uninformed" by Czekalski. OIG Mem. at 3; *see* Donohue Dep. at 126-28.  But there is no question that Czekalski proffered evidence from which a jury could have concluded that each of the four reasons offered in the contemporaneous memorandum was false, and that Donohue's subsequent clarifications represented nothing more than back-pedaling.  From this evidence, a jury could have concluded that "the employer's stated reason was pretextual and that the true reason was discriminatory."  *Stella*, 284 F.3d at 144 (citing *McDonnell Douglas*, 411 U.S. at 804).  Based on the record before us, "we see no circumstances . . . that would preclude a rational factfinder from inferring discrimination from pretext." *Murray*, 406 F.3d at 715 (D.C. Cir. 2005).

V

Finally, we consider "any further evidence of discrimination that may be available to the plaintiff," as well as "any contrary evidence that may be available to the employer."  *Aka*, 156 F.3d at 1289.

Czekalski offered independent evidence that Donohue harbored discriminatory attitudes toward women.  Burton Gifford, a male employee in AND, testified that Donohue "just doesn't give women, that I have observed, any credibility for what they're saying, or even acknowledge they said it, in some cases."  Gifford Dep. at 80.  He also testified that Donohue gave male employees "preference in program responsibilities, which included apparent forgiveness for slippag[es] in schedule and or

costs," while treating female employees with similar difficulties dismissively. *Id.* at 20-21. Another male employee, Dr. Charles Overby, testified that Donohue treated women in a "sexist" and "demeaning" manner. Overby Dep. at 40.

Both men pointed to specific events to substantiate their testimony. Gifford described an incident in which Donohue turned his back on a female subordinate who disagreed with him in a meeting. Gifford Dep. at 79; *see also id.* ("[Donohue] turns away from it and refuses to deal with it when women are making these comments. He just turns to someone else and goes on with his agenda, as opposed to when a man . . . makes that type of statement."). And Overby related an episode in which Donohue was "cavalier and rude" to a high-ranking female administrator in a belittling way -- essentially telling her that "[y]ou don't have to worry your head about that." Overby Dep. at 39.

In *Aka v. Washington Hospital Center*, we recognized that evidence "of discriminatory statements or attitudes on the part of the employer" may support a verdict for a Title VII plaintiff. 156 F.3d at 1289; *see also Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758 (D.C. Cir. 2002) (reversing a grant of summary judgment to an employer in a Title VII case where, inter alia, a supervisor had made disparaging comments about the plaintiff's gender and ethnic background). When viewed in conjunction with Czekalski's strong evidence of pretext, this testimony would permit a reasonable jury to rule in her favor.

To counter this evidence of animus, the government relies on testimony tending to show that "Dr. Donohue was rude and dismissive toward most other employees, male and female." Appellee's Br. 10. In the government's view, Donohue was apparently an equal-opportunity abuser, who "treated both men and women harshly." *Id.* at 24. Perhaps. But Czekalski's witnesses testified to the contrary. *See* Gifford Dep. at 21, 80

(testifying that Donohue treated women differently, and far more dismissively, than he treated men); Overby Statement at 1 (same). This is a dispute we cannot resolve without evaluating witness credibility and weighing the evidence, neither of which is appropriate at the summary judgment stage.

The government also points to the fact that Donohue, "being fully aware that [Czekalski was] a female," was the person who selected her for the position of Director of AND in the first place, and who subsequently recommended her for a Senior Executive Service pay level increase. Appellee's Br. 29-30. To be sure, this is probative evidence against the claim that he harbored a general animus against female employees. *See Waterhouse*, 298 F.3d at 996. But the fact that Donohue once promoted Czekalski cannot immunize him from liability for subsequent discrimination, nor is it alone sufficient to keep this case from the jury. In light of all of Czekalski's evidence, a reasonable trier of fact could conclude that Donahue reassigned her for a discriminatory reason.

## VI

Because we find that a reasonable jury could render a verdict in favor of Czekalski, the magistrate judge's grant of summary judgment in favor of the government is

*Reversed.*